UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JAMES M. LEWIS, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:20-cv-00640-JRS-DLP ) |
| PAUL TALBOT, et al. | ) ) |
| Defendants. | ) |

**Order Granting Motion for Summary Judgment and Directing Entry of Final Judgment**

Plaintiff James Lewis, an Indiana inmate, filed this lawsuit pursuant to 42 U.S.C. § 1983 alleging that the defendants were deliberately indifferent to his trigger thumb condition in violation of his Eighth Amendment rights when he was at Pendleton Correctional Facility. The defendants have moved for summary judgment on Mr. Lewis's claims. For the following reasons, the motion for summary judgment is **GRANTED**.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and is not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion. *Grant v. Trustees of Ind. Uni.,* 870 F.3d 562, 572-73 (7th Cir. 2017). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II. Facts

### A. The Parties

#### 1. Plaintiff James Lewis

Mr. Lewis started complaining of pain in his thumb in March of 2019. Dkt. 79-1 at 1-2. He was diagnosed with trigger thumb, which can cause pain, stiffness, and a sensation of locking. Dkt. 79-3 ¶ 10. Trigger thumb can prevent one from doing daily tasks in severe cases. *Id.* Treatment

generally consists of using medical devices, including splints, medications, self-care, and in some instances, a medical procedure. *Id.*

### 2. The Defendants

Paul A. Talbot and Alice Buckley, worked for Wexford of Indiana, LLC as doctors at Pendleton during times relevant to the complaint. Dkt. 79-5 ¶ 1-2; dkt. 79-4 at ¶ 2.

Michael A. Mitcheff, D.O. is a doctor who, during the times relevant to the complaint, worked as the Regional Medical Director for Wexford. Dkt. 79-3 at ¶ 1, 2.

## B. Mr. Lewis's Medical Care

### 1. Initial Treatment

In March 2019, Mr. Lewis submitted a healthcare request stating that he was having pain in his right thumb. Dkt. 79-1 at 1-2. He was seen by a nurse who noted that he did not present with any swelling, numbness, or discoloration. *Id.* She educated him on stretches he could try to reduce his pain. *Id.* Mr. Lewis was seen again in nursing sick call for his complaint about his thumb on April 8, 2019. *Id.* at 14-16. The nurse noted that the thumb was locked and could not move. *Id.* At the nurse's request, Dr. Talbot assessed the thumb and ordered an x-ray, a splint, and prednisone to reduce possible inflammation. *Id.* This splint involved using Coband tape and a tongue depressor. Dkt. 82 at 8 ¶ 30.

On April 25, 2019, because Mr. Lewis reported that his thumb was feeling worse, Dr. Talbot submitted an outpatient request for him to receive a trigger-thumb injection because he believed that Mr. Lewis was experiencing chronic trigger thumb that had failed attempted conservative treatment. Dkt. 79-1 at 99-102. Dr. Mitcheff initially deferred this request and asked for additional information, including what conservative measures had been attempted. Dkt. 79-2

at 3. Dr. Mitcheff explains that he wanted this additional information because Mr. Lewis had reported to medical only twice regarding his thumb pain. Dkt. 79-2 ¶ 9.

Dr. Talbot saw Mr. Lewis again on May 9, 2019, when he discussed how to properly splint his thumb and provided a supply of Coban tape to splint it for thirty days. Dkt. 79-1 at 108-11. Dr. Talbot also ordered Mobic for pain and swelling and ordered a follow-up in one month. *Id.*

Then, in early June, during a collegial call between Dr. Mitcheff, Dr. Talbot, and Nurse Practitioner Elaine Purdue, it was decided that the trigger thumb injection would be deferred in favor of continued conservative and monitored care onsite. Dkt. 79-3 ¶ 11; dkt. 79-2 at 3.

Dr. Talbot saw Mr. Lewis a few days after the collegial call for his follow-up. Dkt. 79-1 at 112-15. Dr. Talbot requested a specific trigger-thumb brace. Dkt. 79-5 ¶ 11. He explains that a "trigger finger splint works by immobilizing the impacted finger while allowing the rest of the hand to still perform daily tasks. Additionally, the splint is adjustable so it can immobilize any finger on the hand and provides swift pain relief." *Id.* Mr. Lewis disputes that the splint could immobilize any finger and asserts that it did not provide him swift pain relief. Dkt. 82 at 10 ¶ 34-35.

### 2. Trigger Thumb Injection and Surgery

In early August, Dr. Talbot submitted an outpatient request for Mr. Lewis to be provided with a trigger finger injection. Dkt. 79-1 at 21-23. That request was granted, and Mr. Lewis was scheduled to be seen for the steroid injection on August 26, 2019. Dkt. 79-2 at 4-5.

Two days after the injection, Dr. Talbot submitted an outpatient request for a follow-up visit with the provider who completed the steroid injection. Dkt. 79-1 at 29-32. Before authorizing this request, Dr. Mitcheff asked Dr. Talbot for more information, including a copy of the notes from the appointment after the trigger injection and an update on the status of the thumb. *Id.* at 36.

4

Dr. Mitcheff asked that this information be provided to him within a few weeks so it could be reviewed before authorizing another offsite appointment. Dkt. 79-3 at ¶ 13. After Dr. Talbot met with Mr. Lewis for an additional consult in September 2019, based on Dr. Talbot's impression that he believed the injection did not work as expected, Dr. Mitcheff authorized an additional follow-up appointment with the orthopedic provider. Dkt. 79-1 at 36-39; dkt. 79-3 ¶ 13.

Mr. Lewis had a consultation with the orthopedic provider in October 2019, who referred him to a hand surgeon and recommended a right thumb spica brace. Dkt. 79-1 at 42-44; dkt. 82-2 at 14. Dr. Talbot requested the referral to the surgeon a few days after this appointment. Dkt. 79-1 at 42-44. Mr. Lewis saw the surgeon on November 20, 2019, who recommended surgery. *Id.* at 45-49. Dr. Talbot requested the surgery, and it was approved and took place in January of 2020. *Id.* at 45-50. Dr. Talbot did not see Mr. Lewis again after he requested the surgery. Dkt. 79-5 ¶ 21.

### 3. Post-Surgical Treatment

Dr. Buckley saw Mr. Lewis on January 21, 2020, for a follow-up after the trigger-thumb surgery. Dkt. 79-1 at 50-53. Mr. Lewis did not have any bleeding or other concerns, and his hand was still immobilized in the bandage provided by the hospital. *Id.* After reviewing the surgeon's notes, Dr. Buckley advised Mr. Lewis to use his hand for light tasks and noted the surgeon's recommendation for follow-up. *Id.* Dr. Buckley also noted that the hospital had ordered that Mr. Lewis receive Hydrocodone-Acetaminophen/Norco for pain. *Id.* But she was informed that no narcotic pain medications or controlled substances were maintained onsite and were very rarely dispensed at Pendleton.[1] Dkt. 79-4 ¶ 6. Mr. Lewis was provided with Tylenol 325mg-650mg every

---

[1] Mr. Lewis objects to this testimony as hearsay, but, not only is it not dispositive here, the Court understands it to be submitted to support Dr. Buckley's state of mind regarding why she ordered Tylenol and, therefore, it is admissible as an exception to the rule against hearsay. Fed. R. Evid. 803(3).

six hours as needed. *Id.* Mr. Lewis states that, at this visit, Dr. Buckley told him that he did not need any pain medication other than Tylenol. Dkt. 82 at 7. Mr. Lewis explains that, when he returned from the hospital, his thumb was still numb from anesthesia, but that the surgery did cause him serious pain. *Id.* He also states that he did not receive any pain medication until January 23, 2020. Dkt. 82 at 8 ¶ 28.

After her appointment with Mr. Lewis, Dr. Buckley submitted an outpatient request for Mr. Lewis to attend his follow-up appointment, which was approved and took place on January 29, 2020. Dkt. 79-1 at 54-56. Mr. Lewis was seen for a second follow-up appointment with the surgeon in February 2020. *Id.* at 66-67. Mr. Lewis also saw an occupational therapist on February 26, 2020. Dkt. 82-2 at 5-8. The therapist's notes indicate that he was referred for therapy by the surgeon and that she planned to see him once per week for eight weeks for "skilled occupational therapy."[2] *Id.* at 8.

In late April 2020, Mr. Lewis saw Dr. Knieser, who noted that Mr. Lewis was not in any acute distress and the surgical site appeared to be healing well. Dkt. 79-1 at 68-70. Mr. Lewis demonstrated full range of motion of the thumb during this appointment. *Id.*

### III. Motion to Add Facts to the Record

In his motion to add facts to the record, Mr. Lewis points to interrogatory responses that he received from the defendants after the summary judgment motion had been briefed and asks to add those responses to the record. That motion is denied because Mr. Lewis has not provided the interrogatory responses themselves. In addition, that motion is based mostly on Mr. Lewis's

---

[2] Mr. Lewis contends that the surgeon recommended physical therapy. He points to medical records that show the surgeon referred him for physical therapy, but, while those notes indicate that he was referred to therapy, those notes do not indicate that the surgeon recommended a certain amount of therapy. Dkt. 82-2 at 5.

6

challenges to the defendants' version of the events, which he has adequately explained in his response to the motion for summary judgment.

## IV. Discussion

### A. Deliberate Indifference Standard

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). However, "not 'every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment.'" *Eagan v. Dempsey*, 987 F.3d 667, 688 (7th Cir. 2021) (quoting *Estelle v. Gamble*, 429 U.S. 97, 105 (1976)). "'To determine if the Eighth Amendment has been violated in the prison medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 751 (7th Cir. 2021) (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc)).

The defendants do not dispute that Mr. Lewis's trigger finger and associated pain constituted a serious medical need. But they argue that they were not deliberately indifferent to it. "The second element of deliberate indifference is proven by demonstrating that a prison official knows of a substantial risk of harm to an inmate and either acts or fails to act in disregard of that risk." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations and citations omitted). A defendant must make a decision that represents "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.*

7

(internal quotation omitted); *see also Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). "To infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

### B. Dr. Talbot

Dr. Talbot saw Mr. Lewis several times during 2019 for his concerns regarding his thumb pain.

First, on April 8, 2019, Dr. Talbot saw Mr. Lewis based on the nurse's referral. Dkt. 79-1 at 14-16. Dr. Talbot ordered an x-ray, a short course of prednisone, and a splint which involved Coban tape and a tongue depressor. *Id.*

About two weeks later, when Mr. Lewis complained to Dr. Talbot that the pain in his thumb was worse, Dr. Talbot requested that Mr. Lewis receive a trigger-thumb injection. *Id.* at 99-102. Dr. Mitcheff deferred that request for additional information regarding the treatment Mr. Lewis had received. Dkt. 79-2 at 3. When Dr. Talbot saw Mr. Lewis again about two weeks after that, he prescribed Mobic for pain and a specific trigger-thumb brace and ordered a follow-up. Dkt. 79-1 at 108-11. Dr. Talbot later participated in a collegial call in which the injection was again deferred in favor of more conservative treatment. Dkt. 79-3 ¶ 11; dkt. 79-2 at 3.

On August 5, 2019, based on Mr. Lewis's continued complaints of pain in his thumb, Dr. Talbot re-submitted the request for Mr. Lewis to receive a trigger finger injection, which was approved. Dkt. 79-1 at 21-23; dkt. 79-2 at 4-5.

When the injection did not resolve Mr. Lewis's pain, Dr. Talbot requested a follow-up, and that request was approved. Dkt. 79-1 at 36-39; dkt. 79-3 ¶ 13. And after Mr. Lewis met with the hand surgeon, Dr. Talbot submitted a request for Mr. Lewis to have surgery. Dkt. 79-1 at 42-44; dkt. 82-2 at 14. That surgery was approved and took place in January of 2020. Dkt. 79-1 at 50. Dr. Talbot did not have any further contact with Mr. Lewis after that. Dkt. 79-5 ¶ 21.

Dr. Talbot argues that he was not deliberately indifferent to Mr. Lewis's serious medical needs because he provided treatment that was necessary, including a splint, trigger thumb brace, consultations, education, and pain relief medication. Mr. Lewis argues that Dr. Talbot persisted in a course of action that he knew to be ineffective. "Persisting in a course of treatment known to be ineffective may support an inference that a medical official recklessly ignored an inmate's serious

medical condition." *Machicote v. Roethlisberger*, 969 F.3d 822, 828 (7th Cir. 2020) (citations omitted). But that is not what happened here. Every time Dr. Talbot saw Mr. Lewis, he tried a splint, different medication, or a referral to a specialist. No reasonable juror could conclude that Dr. Talbot persisted in an ineffective course of care. Mr. Lewis argues that from March 19, 2019 through May 7, 2019, he received Tylenol but not anti-inflammatory medication and that he received no pain medication between June 10 and August 5, 2019. Dkt. 82 at 27. But it is undisputed that, when Dr. Talbot first saw Mr. Lewis, he ordered prednisone and a splint, and every time Dr. Talbot saw Mr. Lewis, he either ordered pain medication or sought additional treatment. Mr. Lewis also argues that Dr. Talbot should have requested a collegial call when he first requested the steroid injection in April of 2019. But Mr. Lewis does not present evidence that such a call would have brought about a different result.[3] These are not circumstances in which a reasonable jury could conclude Dr. Talbot disregarded Mr. Lewis's pain. Dr. Talbot is therefore entitled to summary judgment.

### C. Dr. Buckley

Mr. Lewis saw Dr. Buckley on January 21, 2020, when he returned to Pendleton after his surgery. Dkt. 79-1 at 50-53. The surgeon had instructed that Mr. Lewis's dressing was to be removed after three days, an antibiotic was to be applied, and the wound was to be re-covered with gauze or a Band-Aid once per day. Dkt. 79-1 at 50-52. Dr. Buckley examined Mr. Lewis's hand

---

[3] Mr. Lewis also challenges Dr. Talbot's assertion that he did not have the authority to directly refer patients offsite to receive additional treatment, but instead was required to seek authorization from medical leadership. Mr. Lewis points to a document purported to be Wexford policy, but that document does not dispute the evidence that Dr. Talbot did not have such authority. Dkt. 82-2 at 15-16. Mr. Lewis also points to the case of *Johnson v. Mitcheff*, 2016 WL 3627324 (N.D. Ind. July 7, 2016), in which Dr. Mitcheff argued that final decision-making authority rested not with him, but the prison's onsite doctors. But, at the time relevant to that case, Dr. Mitcheff was the regional medical director for Correctional Medical Services, Inc., not Wexford. *Id.* at *3. That case therefore does not speak to Dr. Talbot or Dr. Mitcheff's responsibilities as Wexford employees.

and ordered Bacitracin ointment. Dkt. 79-4 ¶ 6. But while the surgeon had ordered Hydrocodone-Acetaminphen/Norco 5-325mg for pain, Dr. Buckley consulted with onsite nursing and pharmacy staff and learned that no narcotic pain medications or controlled substances were maintained onsite and were very rarely dispensed at Pendleton. *Id.* Because she understood that narcotic pain medication was not available, Dr. Buckley ordered Tylenol 325mg-650mg every six hours as needed. *Id*. Dr. Buckley also submitted an outpatient request for Mr. Lewis to attend his follow-up appointment with the surgeon. Dkt. 79-1 at 50-53.

Dr. Buckley argues that she was not deliberately indifferent to Mr. Lewis's needs because Mr. Lewis noted that his pain was minimal upon his return to Pendleton, and she ensured that he received a prescription for any residual pain. Mr. Lewis argues that he had minimal pain at the time of his visit with Dr. Buckley because his hand was still numb from the surgery. He also states that Dr. Buckley stated that she is not a hand specialist but believed that he did not need more than Tylenol. Dkt. 82-2 at 10. Mr. Lewis further argues that he received no pain medication until January 23, 2020, two days after his surgery. Dkt. 82-2 at 11. But there is no evidence that, believing that narcotics were unavailable, Dr. Buckley failed to exercise her medical judgment in ordering Tylenol for Mr. Lewis's post-surgical pain. *Norfleet*, 439 F.3d at 396. And to the extent that his prescription was delayed, there is no evidence that Dr. Buckley had any reason to anticipate this delay. *Machicote*, 969 F.3d at 828 (citing *Arnett v. Webster*, 658 F.3d 742, 758 (7th Cir. 2011)).

No reasonable jury could conclude that Dr. Buckley was deliberately indifferent to Mr. Lewis's post-operative pain. She is there entitled to summary judgment.

### D. Dr. Mitcheff

Dr. Mitcheff reviewed and responded to requests for offsite care for Mr. Lewis's trigger thumb. Dr. Mitcheff deferred Dr. Talbot's first request to learn what conservative measures had

been attempted because Mr. Lewis had been seen only twice for thumb pain. Dkt. 79-2 ¶ 9. On June 6, 2019, during a collegial call with Dr. Mitcheff, Dr. Talbot, and Nurse Practitioner Elaine Purdue, it was discussed that the trigger thumb injection would be deferred to continue to provide conservative care. Dkt. 79-3 ¶ 11; dkt. 79-2 at 3. When that care did not resolve Mr. Lewis's pain, he did receive the injection on August 26, 2019. Dkt. 79-1 at 21-23; dkt. 79-2 at 4-5. A few days later, when Dr. Talbot submitted a request for Mr. Lewis to follow up with an orthopedist, Dr. Mitcheff asked Dr. Talbot to provide additional information, including office notes and an update on the status of Mr. Lewis's thumb. Dkt. 79-1 at 36. After Dr. Talbot saw Mr. Lewis again in September 2019, Dr. Mitcheff authorized a follow-up appointment with an orthopedic provider and an appointment with a surgeon. *Id.* at 36-39. The surgeon recommended surgery and that surgery was approved. *Id.* at 48-50.

Dr. Mitcheff argues that he exercised his professional judgment in requesting and pursuing conservative treatment for Mr. Lewis's thumb before approving an injection and, later, surgery. Mr. Lewis argues that Dr. Talbot had already said in April of 2019 that conservative measures had failed. But, Dr. Mitcheff has shown that he exercised his professional judgment in considering the treatment Mr. Lewis had received before approving the injection. And, even if Dr. Talbot initially disagreed, that is not enough to show that Dr. Mitcheff was deliberately indifferent. *Pyles*, 771 F.3d at 409.

Mr. Lewis also argues that the surgeon recommended occupational therapy, but the document he references indicating the recommendation for therapy appears to be authored by the occupational therapist—not the surgeon. Dkt. 82-2 at 5-6. And regardless of who recommended further therapy, Mr. Lewis points to no evidence that Dr. Mitcheff was aware of such recommendation or denied any request for it. Dr. Mitcheff cannot be held liable for failing to

approve a therapy recommendation of which he was not aware. *See Machiote*, 969 F.3d at 828 (citing *Minix v. Canarecci*, 597 F.3d 824, 833-34 (7th Cir. 2010)). This is the case even if, as Mr. Lewis suggests, Wexford policy makes Dr. Mitcheff responsible for all patient care because a violation of company policy does not necessarily rise to the level of a constitutional violation. *See Estate of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017).

Because no reasonable jury could conclude that Dr. Mitcheff failed to exercise his medical judgment in making decisions for Mr. Lewis's care, he is entitled to summary judgment.

## V. Conclusion

For the foregoing reasons, the motion for summary judgment, dkt. [77], is **GRANTED**. Mr. Lewis's motion to add facts to the record, dkt. [88], is **denied**. Judgment consistent with this Order and the Order of March 16, 2020, dkt. 8, shall now issue.

Date: 3/21/2022

*[signature]*

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

JAMES M. LEWIS
964417
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

Douglass R. Bitner
KATZ KORIN CUNNINGHAM, P.C.
dbitner@kkclegal.com

Rachel D. Johnson
KATZ KORIN CUNNINGHAM, P.C.
rjohnson@kkclegal.com